| | | |
|---|---|---|
| XP SERVICES, INC., RODNEY ALLISON, and THE RODNEY ALLISON 2019 IRREVOCABLE TRUST, | ) ) ) ) | |
| *Plaintiffs/Counter-Defendants,* | ) ) | Case No. 3:26-cv-00072-KAC-DCP |
| v. | ) ) | |
| JOHN PHILLIP HALL II and TRICION, INC., | ) ) ) | |
| *Defendants/Counter-Plaintiffs.* | ) ) | |

## DEFENDANT/COUNTER-PLAINTIFF HALL'S RESPONSE IN OPPOSITION TO PLAINTIFFS' PARTIAL MOTION TO DISMISS FIRST AMENDED COUNTERCLAIM

### I. Introduction

Defendant/Counter-Plaintiff John Phillip Hall II ("Hall") respectfully submits this response in opposition to the Partial Motion to Dismiss First Amended Counterclaim filed by Plaintiffs/Counter-Defendants XP Services, Inc., Rodney Allison, and The Rodney Allison 2019 Irrevocable Trust (collectively, "Plaintiffs"). (Doc. 73.)

Three features of the Partial Motion frame this response. **First**, Plaintiffs do not challenge the counterclaim's ownership spine. Counts I (Declaratory Judgment), II (Breach of Contract), VIII (Unjust Enrichment, pleaded in the alternative), and IX (Accounting) are unchallenged on the pleadings. The ownership issue will proceed to adjudication on the merits, and Hall's Motion for Summary Judgment on that issue is scheduled for filing on May 8, 2026. **Second**, the Partial Motion's core argument on Count IV – that Hall "is not" a shareholder – assumes the very question

that is the subject of Count I, the pending Motion for Summary Judgment, and Plaintiffs' own admission that "an actual controversy exists regarding ownership of XP Services." (Doc. 75 ¶ 18.) That question cannot be resolved on a pleading motion. **Third**, each targeted count is supported by concrete, dated factual allegations – not bare legal conclusions – and each satisfies the plausibility standard of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), when read in the light most favorable to Hall.

The Partial Motion should be denied. In the alternative, if any count is dismissed, Hall respectfully requests leave to amend under Federal Rule of Civil Procedure 15(a)(2). *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## II. Plaintiffs' Partial Motion Is Procedurally Improper

Plaintiffs' Partial Motion suffers from independent procedural defects, any one of which warrants denial.

**A. Plaintiffs simultaneously answered the very counts they purport to dismiss.** On the same day Plaintiffs filed Doc. 73 (Partial MTD attacking Counts III–VII), they also filed Doc. 75 – Plaintiffs' Answer to First Amended Counterclaims – which responds in full to those very counts. (See Doc. 75 ¶¶ 26–31 (Count III); ¶¶ 32–36 (Count IV); ¶¶ 37–42 (Count V); ¶¶ 43–47 (Count VI); ¶¶ 48–52 (Count VII).) Federal Rule of Civil Procedure 12(b) requires that a motion under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed." By simultaneously pleading to the same counts they purport to dismiss, Plaintiffs forfeited Rule 12(b)(6) as the procedural vehicle.

**B. The proper vehicle is now Rule 12(c).** Failure-to-state-a-claim survives the answer under Rule 12(h)(2), but only as a Rule 12(c) motion for judgment on the pleadings, not as a Rule

12(b)(6) motion. Fed. R. Civ. P. 12(h)(2)(B). The Rule 12(c) standard "is analyzed using the same de novo standard of review employed for a motion to dismiss under Rule 12(b)(6)." *Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 549 (6th Cir. 2008). The procedural difference, however, is material: under Rule 12(c), the Court takes "as true all well-pleaded material allegations in the opposing party's pleadings," *Fla. Power Corp. v. FirstEnergy Corp.,* 810 F.3d 996, 999–1000 (6th Cir. 2015), and considers the answer alongside the counterclaim. Plaintiffs' Answer (Doc. 75) admits foundational facts – including that the Stock Purchase Agreement ("SPA") and First Amendment were valid contracts (Doc. 75 ¶¶ 1, 2, 22), that no Notice of Termination was served before September 28, 2025 (Doc. 75 ¶ 15), and that an actual controversy regarding ownership exists (Doc. 75 ¶ 18) – that strengthen, not weaken, Hall's counterclaims. Plaintiffs cannot use Rule 12(b)(6) procedure to bypass the pleading admissions they have now made. These Rule 12(b)(6) defects (Sections II.A and II.B) apply to Plaintiffs' attack on Counts III, V, VI, and VII; the Rule 12(b)(1) standing challenge to Count IV survives the answer under Rule 12(h)(3) and is addressed on the merits in Section VI below.

**C. The certification of conferral compliance is inaccurate.** The Partial Motion's certification of compliance with this Court's Order Governing Motions to Dismiss (Doc. 11) does not accurately reflect the pre-filing record. The exchange consisted of a single April 20, 2026 email from Plaintiffs' counsel telegraphing an intent to move and Hall's reply deferring substantive response until after the filing was in hand. Hall did not engage on the substance of any count and did not agree that any pleading was uncurable by amendment. The Court may deny the Partial Motion on this independent procedural ground as well.

Plaintiffs' Partial Motion should be denied as procedurally improper. Even if the Court reaches the merits, the Motion fails for the substantive reasons set forth below.

### III. Legal Standard

On a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and construe the pleading in the light most favorable to the nonmovant. *Iqbal*, 556 U.S. at 679; *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). The pleading need not prove the ultimate facts; it need only "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is plausible when the pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When the pleading at issue is a pro se filing, courts apply "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Hall's First Amended Counterclaim (Doc. 58) was filed pro se and is entitled to that liberal construction.

A Rule 12(b)(1) challenge based on Article III standing does not relieve the Court from applying the plausibility standard to factual allegations. Where standing is contested on a facial attack, the Court accepts the pleading's factual allegations as true; where the challenge is factual, the Court may weigh evidence. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004); *see also Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Where the jurisdictional question is intertwined with the merits, however, the Court may not resolve on the pleadings genuinely disputed material facts that are themselves the subject of other live claims in the case. *Gentek*, 491 F.3d at 332.

Federal Rule of Civil Procedure 9(b) requires fraud to be pleaded with particularity – time, place, content, scheme, intent, and injury. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007). Rule 9(b) does not require evidentiary detail at the pleading stage; it requires the defendant to be placed on fair notice of the alleged fraudulent conduct.

4

**IV. Count V (Fraud and Fraudulent Concealment) Satisfies Rule 9(b) and States a Claim**

The factual core of Count V is straightforward and dated. In April 2024, XP Services ("XPS") unlawfully recharacterized the recorded status of aviation parts (PIN/SEAT Part Number 4083144) from "As-Removed" to "New" and issued a "New" certification it had no authority to issue. XPS lacked the Technical Maintenance Manuals and the authorized Pratt & Whitney engine technician required to inspect the parts in order to issue an inspection certification or to certify the parts as "New", "Used", or "Overhauled"; and the XPS employee who recorded the "New" status was not a Certified Aviation Technical Inspector. Parts recorded as "Used" or "As-Removed" cannot be labeled or certified as "New". The unauthorized status change – and the falsification of the maintenance record reflecting that change – violated 14 C.F.R. § 43.12 (then in effect), which prohibits any fraudulent or intentionally false entry in any record required to be made, kept, or used to show compliance with Federal Aviation Administration ("FAA") maintenance regulations. (Ex. V (Doc. 35-3 at HALL0197) at HALL0198–HALL0200.) Mr. O'Brien, the Chief Executive Officer of ProAeronautics, the customer that received the misclassified parts, directly notified Mr. Allison of the violation in 2024. (Id.) On February 13, 2025, Mr. Allison signed the SPA, which at § 3.18(a) represented that XP Services "has complied, and is now complying, with all Laws applicable to it or its business, properties, or assets." (Pl. Ex. 1, SPA § 3.18(a) (HALL0235).) Hall paid the negotiated Purchase Price in reliance on that representation. The April 2024 violation, known to Mr. Allison, was concealed from Hall during the negotiation and at execution. Each element of fraudulent inducement under Tennessee law follows from this dated record.

Tennessee law has long distinguished between (a) breach of a contractual representation, actionable as breach of warranty under contract law, and (b) misrepresentation of an existing fact made to induce the counterparty to execute the contract, actionable as fraud-in-the-inducement under tort law. The Tennessee Supreme Court has stated the elements of intentional

5

misrepresentation – also called fraudulent misrepresentation or fraud, as the same cause of action under three names – as follows: (1) representation of a present or past fact; (2) the representation was false when made; (3) the representation involved a material fact; (4) the defendant either knew falsity, did not believe truth, or made the representation recklessly without knowing whether it was true or false; (5) the plaintiff did not know of the falsity and was justified in relying; and (6) the plaintiff sustained damages from the representation. *Hodge v. Craig*, 382 S.W.3d 325, 342–43 (Tenn. 2012) (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)); see also *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). The Partial Motion argues that Count V fails because (a) it is a repackaged breach of contract, (b) Hall alleges no pre-contract misrepresentation, (c) Hall has pleaded no duty to disclose, and (d) any promissory-fraud theory fails for want of contemporaneous intent not to perform. (Doc. 74 at 11–14.) Each argument fails on inspection of the pleading.

**A. Count V pleads pre-contract misrepresentation rooted in SPA § 3.18.** The Partial Motion's memorandum addresses every paragraph of Count V except § 3.18 – the representation on which the fraud theory is principally built. Section 3.18(a) of the SPA provides that XP Services "has complied, and is now complying, with all Laws applicable to it or its business, properties, or assets." (Pl. Ex. 1, SPA § 3.18(a) (HALL0235).) That representation was made on February 13, 2025, when the SPA was signed. The counterclaim alleges, and Ex. V already in the record (the O'Brien letter at HALL0198–HALL0200) documents, that in 2024 XP Services had engaged in a false certification of aviation parts – issuing a "New" status certification without authority to do so, where XPS lacked the Technical Maintenance Manuals, the authorized Pratt & Whitney engine technician, and the Certified Aviation Technical Inspector required to certify the parts for the

engine for which they were intended – and that Allison had been directly informed of the violation. When Allison executed the § 3.18 representation on February 13, 2025, the representation was knowingly false as to past compliance and as to then-current compliance with FAA standards. The April 2024 false certification was material because it created continuing federal regulatory exposure under 14 C.F.R. § 43.12 (then in effect), implicated XPS's authority to certify aviation parts going forward (a core operational capability of the business Hall purchased), and directly affected the customer relationship with ProAeronautics – the very customer whose CEO contemporaneously notified Mr. Allison of the violation in 2024 (Ex. V, HALL0198–HALL0200).

A representation is pre-contract for fraud purposes when it is made to induce the execution of a contract and is itself a representation of present or past fact. Hodge, 382 S.W.3d at 343. The dispositive question is not whether the representation appears inside or outside the integrated contract; it is whether the representation was an existing-fact misrepresentation made to induce execution. Section 3.18 represented both that XP Services "has complied" (past tense) and "is now complying" (present tense) with all Laws applicable to it. Both prongs are existing-fact representations – not future-performance promises. The April 2024 violation, known to Allison, rendered both prongs false at the moment of execution. Tennessee treats fraud in the inducement as sounding in tort – distinct from breach of the contract's performance obligations. *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976) (parol evidence rule inapplicable to a claim of fraudulent misrepresentation inducing the execution of a contract). The Partial Motion's silence on § 3.18 is not accidental; it is the core of the fraud theory and it is squarely pleaded.

**B. The independent-duty doctrine does not bar a fraud-in-the-inducement claim.** The authorities Plaintiffs cite – *Communications Unlimited Contracting Services, Inc. v. Comdata, Inc.*,

611 F. Supp. 3d 483 (M.D. Tenn. 2020), and *Town of Smyrna v. Municipal Gas Authority of Georgia,* 129 F. Supp. 3d 589 (M.D. Tenn. 2015) – address fraud claims predicated on breach of a contract's performance terms; the same pattern appears in *EPAC Techs., Inc. v. Thomas Nelson, Inc.,* 438 F. Supp. 3d 847, 853 (M.D. Tenn. 2018), aff'd, 810 F. App'x 389 (6th Cir. 2020) (applying New York law), and *Calipari v. Powertel, Inc.,* 231 F. Supp. 2d 734, 736 (W.D. Tenn. 2002). None of these authorities applies to pre-contract misrepresentations that induced execution of the contract in the first place; Count V's foundation in SPA § 3.18 takes it outside their scope. Tennessee courts have applied the fraud-in-the-inducement framework to stock-sale transactions where the seller concealed an existing material fact at closing. In *Lamb v. MegaFlight,* Inc., 26 S.W.3d 627 (Tenn. Ct. App. 2000), the Tennessee Court of Appeals held that buyers in a stock purchase were fraudulently induced into the contract where the seller concealed at closing that the seller's president was incarcerated for money laundering and tax evasion. The court held the seller's misrepresentation of an existing material fact supported rescission of the contract. The same framework applies here: Allison concealed an existing material fact – the 2024 federal aviation regulatory violation, which created ongoing legal exposure to XP Services – at the moment of SPA execution. A contrary rule would insulate every fraudulent inducement from tort liability the moment a contract is signed, which is not Tennessee law. Reliance is presumed where the alleged misrepresentation is embedded as a contractual representation that induced the counterparty to execute the agreement. See *First National Bank v. Brooks Farms*, 821 S.W.2d 925, 927 (Tenn. 1991) (where representations were made to induce a purchase, the plaintiffs "would be presumed to rely upon these representations").

**C. Rule 9(b) particularity is satisfied.** The counterclaim pleads each element with specificity: (i) time – the April 2024 unauthorized parts recharacterization; the February 13, 2025

execution of the SPA; (ii) actor – XP Services, by and through Allison as CEO; (iii) content – the unauthorized recharacterization of aviation parts (PIN/SEAT Part Number 4083144) from "As-Removed" to "New" status, and the issuance of a "New" certification by an XPS employee who was not a Certified Aviation Technical Inspector, where XPS lacked the Technical Maintenance Manuals and authorized Pratt & Whitney engine technician required to inspect the parts in order to issue an inspection certification or to certify the parts as "New", "Used", or "Overhauled". "Used" or "As-Removed" parts cannot be labeled or certified as "New", in violation of 14 C.F.R. § 43.12 (then in effect); (iv) place – the SPA closing context, with the embedded § 3.18 representation of legal compliance; (v) scheme – the prior false aviation-parts certification and Allison's concealment of it from Hall; (vi) Allison's knowledge – Mr. O'Brien (CEO of ProAeronautics, the customer that received the misclassified parts) directly notified Allison of the violation in 2024 (Ex. V, HALL0198–HALL0200); (vii) concealment – Allison did not disclose the 2024 violation to Hall during SPA negotiation or at execution on February 13, 2025; (viii) intent – inducement of Hall's execution of the SPA at a negotiated purchase price; and (ix) injury – Hall's purchase of a business burdened with undisclosed regulatory exposure. (Doc. 58 ¶¶ 37–42; Hall Decl. Ex. V (Doc. 35-3 at HALL0197) at HALL0198–HALL0200.) Rule 9(b) requires fair notice of the conduct constituting the alleged fraud, not evidentiary precision at the pleading stage. *Bledsoe*, 501 F.3d at 504. The pleading provides Plaintiffs full notice of the specific representations, speakers, dates, regulatory framework, and conduct on which the fraud theory rests.

**D. The duty to disclose arises from the § 3.18 representation itself.** The Partial Motion cites *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 571 (6th Cir. 2003), for the proposition that no duty to disclose exists in arm's-length transactions. (Doc. 74 at 13.) *Shah* addresses situations in which the contract contains no affirmative representation on the undisclosed subject. Here, the

SPA contains an affirmative representation – § 3.18 – on the very subject of legal compliance. When a party affirmatively represents compliance with law in a contract, the party thereby assumes an obligation to disclose known non-compliance. Concealment of known non-compliance in the face of an affirmative representation of compliance is itself a fraud on the counterparty, regardless of whether the underlying relationship would support a general disclosure duty in other contexts.

**E. The promissory-fraud argument is inapposite.** The Partial Motion's final argument is that Count V fails as promissory fraud because the alleged misrepresentations "begin in December of 2025," months after the SPA was executed. (Doc. 74 at 13–14.) That argument addresses only the supplemental December 2025 conduct (three acknowledgments followed by attempted termination) and ignores the § 3.18 inducement theory. Count V is principally a fraud-in-the-inducement claim based on a pre-contract misrepresentation, not a promissory-fraud claim. The promissory-fraud cases Plaintiffs cite do not displace the settled Tennessee rule that misrepresentations inducing contract execution are actionable in tort. Plaintiffs' citation to *Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn. 1978), is consistent with this conclusion. *Fowler* addresses the standard for promissory fraud – a doctrine premised on a promise of future action without present intent to perform. Count V is not a promissory-fraud claim. It is a fraudulent-inducement claim based on the misrepresentation of an existing fact: that XP Services "has complied, and is now complying, with all Laws," made when the April 2024 violation rendered that representation false at the moment of execution.

**F. Alternative ground: post-closing fraudulent concealment.** Even if the Court were to look beyond the pre-contract § 3.18 misrepresentation, Plaintiffs' three written acknowledgments of the deposit (Exs. U, B, C) followed by their abrupt reversal on December 12, 2025, independently support a fraudulent-concealment theory after closing. Plaintiffs' contemporaneous

written acknowledgments lulled Hall into reliance on the closing's validity during the 75 days following the deposit, while Plaintiffs concealed their intent to repudiate. Tennessee recognizes fraudulent concealment as a stand-alone theory where a party with a duty to speak conceals material information that the other party is entitled to know. Either theory – pre-contract misrepresentation under § 3.18 or post-closing concealment of repudiation intent – supplies an independent legal basis for Count V. The reliance element is independently and adequately pleaded in either framing. The First Amended Counterclaim alleges that Hall "paid the negotiated Purchase Price" in reliance on the § 3.18 representation (Doc. 58 ¶ 38), and the dated chronology supplies the inferential basis: Hall closed the SPA after Mr. Allison signed the § 3.18 representation, with Hall having no knowledge of the April 2024 false certification of which Mr. Allison had been directly informed by Mr. O'Brien (Ex. V, HALL0198–HALL0200). Rule 9(b) requires fair notice of the conduct constituting the alleged fraud, including reliance – not evidentiary specificity at the pleading stage. Bledsoe, 501 F.3d at 504.

**G. Milan Supply Chain Solutions does not bar Count V.** Plaintiffs do not cite *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), in their MTD memorandum. To the extent the Court considers the economic-loss doctrine *sua sponte, Milan* does not preclude Count V. *Milan* held that the economic-loss doctrine bars fraud-inducement claims where (a) the parties are sophisticated commercial entities, (b) the plaintiff seeks recovery of only economic losses, and (c) the misrepresentations are "premised solely on misrepresentations or nondisclosures about the quality of goods that are the subject of a contract." *Id.* at 153. None of those preconditions is met here. First, the SPA is a stock purchase agreement, not a contract for the sale of goods; *Milan*'s holding is expressly tied to UCC sale-of-goods law. Second, Hall seeks declaratory judgment establishing his ownership in addition to compensatory damages – equitable

relief that is not "purely economic" within the meaning of the *Milan* rule. Third, the § 3.18 misrepresentation does not concern the "quality or character of goods." It concerns regulatory compliance with federal aviation law (FAA Regulations and ICAO Standards). Concealment of an extant regulatory violation that creates independent legal exposure is fundamentally different from misrepresentation about the quality of an asset. Fourth, the Tennessee Supreme Court in *Milan* expressly stopped short "of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule" in Tennessee, deferring "that question to a future case in which the facts may warrant it." *Id.* at 156. The facts here warrant the exception.

### V. Count III (Tortious Interference With Business Relationships) States a Claim

The Tennessee Supreme Court in *Trau-Med of America, Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691, 701 (Tenn. 2002), recognized the tort of intentional interference with business relationships and enumerated five elements, including (3) the defendant's intent to cause the termination of the relationship and (4) improper motive or improper means. *Id.* at 701. Plaintiffs challenge only elements (3) and (4). (Doc. 74 at 9–11.) Both elements are adequately pleaded.

**A. Improper means is independently pleaded.** *Trau-Med* expressly identifies a non-exhaustive list of improper means in footnote 5, including: violations of statutes, regulations, or recognized common-law rules; fraud, misrepresentation, or deceit; breach of a fiduciary relationship; misuse of inside or confidential information; and methods that violate an established standard of a trade or profession, such as sharp dealing, overreaching, or unfair competition. 71 S.W.3d at 701 n.5. The First Amended Counterclaim pleads several categories from that list.

First, Hall pleads Troy Allison's misuse of inside or confidential information. The First Amended Counterclaim alleges that on December 6, 2025, Troy Allison met with Mr. Alghrairi in Abu Dhabi and learned the full scope and value of Hall's Calidus pipeline. (Doc. 58 ¶ 29(b).)

Allison thereafter used that confidential information to make direct contact with Calidus and to negotiate the same opportunities for himself. (Doc. 58 ¶ 29(b)–(d).) *Trau-Med* expressly identifies "misuse of inside or confidential information" as improper means. 71 S.W.3d at 701 n.5. This conduct is independently wrongful – it is not a breach of the SPA but a separate misappropriation. Second, Hall pleads Allison's fraud and misrepresentation in connection with the SPA as additional improper means. The same fraud-inducement conduct supporting Count V – concealment of the April 2024 regulatory violation; the false § 3.18 representation embedded in the SPA at execution – supplies improper means under *Trau-Med* footnote 5, which lists "fraud, misrepresentation, or deceit." *Id.* The fraud is independent of the contract because the misrepresentation predates execution. Third, Hall pleads Allison's sharp dealing and conduct outside the legitimate scope of post-closing dealings: (a) signing the Global Aerospace Logistics ("GAL") Memorandum of Understanding ("MOU") with a direct competitor of Calidus to undermine Hall's principal pipeline relationship; (b) representing to Calidus and other third parties that Hall had no ownership interest despite three written acknowledgments of the closing deposit; and (c) excluding Hall from communications with Calidus despite Hall's repeated requests. (Doc. 58 ¶¶ 29(a)–(d).) These acts fall within *Trau-Med* footnote 5's category of "methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition." *Id.* Fourth, and additionally, Hall pleads Plaintiffs' breaches of SPA §§ 5.02 through 5.04 – the non-circumvention, exclusivity, and prohibited-action provisions. (Doc. 58 ¶¶ 26–30.) The Court need not reach whether contract breach alone constitutes improper means; the improper-means element is independently satisfied by the categories above without reference to the SPA breach.

The Partial Motion's argument that "self-enrichment" is never an improper motive in the prospective-interference context (Doc. 74 at 10–11) misreads *Trau-Med*. *Trau-Med* requires either improper motive *or* improper means; the two are alternatives. 71 S.W.3d at 701. Even assuming self-enrichment alone cannot satisfy the motive element in a pure-competitor setting, Hall's pleading does not rest on motive alone – it pleads each of the independent improper-means categories identified above. The Partial Motion's memorandum does not address *Trau-Med* footnote 5.

**B. Intent to interfere is pleaded with specificity.** The First Amended Counterclaim identifies specific dated acts that plausibly establish intent: the December 6, 2025 Abu Dhabi meeting where Troy Allison learned the scope of Hall's Calidus pipeline; Allison's December 14, 2025 letter to Calidus (Ex. J (Doc. 35-3 at HALL0116)) communicating XP Services' changed position; Allison's direct negotiations with Calidus during December 2025 and January 2026; and the execution of the GAL MOU (Ex. O (Doc. 35-3 at HALL0149)), which the counterclaim alleges was used to circumvent Hall's relationships. (Doc. 58 ¶¶ 26–29.) These are not conclusory allegations; they are concrete acts with dates, identities, and a coherent causal chain. Hall's contemporaneously filed Third Declaration and supporting exhibits provide additional documentary corroboration of these acts, including Mr. Alghrairi's December 17, 2025 selective transmission of only Mr. Allison's commitment letter to Calidus while suppressing Hall's parallel Owner Letter (Ex. JJ; Third Declaration ¶¶ 18–20), Hall's January 24, 2026 contemporaneous written complaint of "secret Calidus negotiations" directly to Mr. Allison (Ex. LL), and the February 5–10, 2026 email exchange in which Calidus disclosed it had been negotiating equity participation with three separate parties – including a third party in the UAE Hall identifies as Mr. Alghrairi (Ex. MM; Third Declaration ¶¶ 32–33).

**C. The competitor privilege does not apply.** The Partial Motion relies on *Freeman Management Corp. v. Shurgard Storage Centers, LLC,* 461 F. Supp. 2d 629 (M.D. Tenn. 2006), for the proposition that competitors are privileged to pursue their own interests. *Freeman* addressed interference by a market competitor. Allison is not Hall's competitor – he is the seller of the very business Hall purchased. Self-enrichment through the clawback of a business that the seller has already transferred is not market competition, and *Freeman*'s competitor privilege does not insulate it.

### VI. Count IV (Breach of Fiduciary Duty) States a Direct Claim for Distinct Injury

Plaintiffs attack Count IV on two grounds: a Rule 12(b)(1) standing challenge asserting that the claim is corporate and therefore derivative, and an alternative Rule 12(b)(6) argument that the pleading does not satisfy the particularized demand requirement of Rule 23.1. Both fail.

**A. The claim is pleaded as a direct action for distinct injury under *Keller*.** In *Keller v. Estate* of McRedmond, 495 S.W.3d 852 (Tenn. 2016), the Tennessee Supreme Court adopted the analytical framework of *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), for determining whether a shareholder's claim is direct or derivative. 495 S.W.3d at 877. The analysis turns on two questions: (1) who suffered the alleged harm – the corporation or the shareholder individually; and (2) who would receive the benefit of any recovery. *Id.* at 875, 877. A direct action lies where the shareholder suffers a distinct injury, such as denial of access to corporate records, wrongful inducement to sell or transfer stock, or direct fraud. See *id.* at 869–80.

| Tooley/Keller Prong | Typical Derivative Claim | This Case |
|---|---|---|
| **(1) Who suffered the alleged harm?** | The corporation | Hall personally – denial of his contractually-purchased 100% ownership stake in XP Services |
| **(2) Who would receive the benefit of any recovery?** | The corporation | Hall personally – declaratory judgment of his ownership and direct damages payable to him |

Count IV pleads multiple categories of harm; the *Tooley*/*Keller* analysis applies to each individually. Several of the pleaded harms are paradigmatically direct under *Keller*. (i) Allison's continuing refusal to recognize Hall's contractually-purchased ownership rights – Hall sustains this injury in his individual capacity as the contractual buyer, and recovery (declaratory judgment of ownership) flows to Hall personally. (ii) Allison's denial to Hall of access to corporate records to which Hall as sole shareholder is entitled under Tenn. Code Ann. § 48-26-101 – this is the paradigm direct injury under *Keller*, 495 S.W.3d at 869. (iii) Allison's filing of a lawsuit on XP Services' purported behalf challenging Hall's ownership without Hall's authorization – Hall sustains this injury as the targeted ownership claimant. (iv) Allison's misrepresentations to third parties (Calidus, GAL, Burwell at Nelson Mullins) that Hall is not the owner – Hall sustains reputational and relational injury individually. Each of these acts targets Hall specifically, and any recovery flows to Hall as the individual whose ownership interest has been impaired. Under *Tooley* and *Keller*, that is a direct claim.

To the extent the Court characterizes any other portion of Count IV as concerning corporate-level injuries – namely, (a) the unauthorized GAL MOU, (b) the unauthorized 40% Calidus negotiation, (c) the use of XP Services funds to fund litigation against the sole shareholder, and (d) the payment of post-closing CEO compensation – Hall pleads those harms in the alternative under Federal Rule of Civil Procedure 8(d)(2) and 8(d)(3), which expressly authorize alternative and inconsistent pleading. The Court need not resolve the ownership question to allow the direct

claims to proceed past the pleading stage; their pleading-stage sufficiency is established by the assumption-of-truth standard, with their merits to be adjudicated in the same proceeding that resolves the ownership question.

The Partial Motion treats Count IV as though the corporation is the injured party and Hall is merely a derivative plaintiff. But the corporation here is XP Services, and Hall's allegation is that he became its sole owner on September 29, 2025. If Hall is correct about ownership – which is what the counterclaim alleges and what the Court must assume on a 12(b)(6) motion – then the conduct challenged in Count IV is not injury to a disinterested corporation; it is Allison's continuing refusal to recognize Hall's ownership, with distinct, individualized injury to Hall.

**B. The standing question cannot be resolved on the pleadings when ownership is itself the central contested issue.** Plaintiffs' Rule 12(b)(1) challenge is properly treated as a facial attack at this stage. On a facial 12(b)(1) attack, the Court accepts the pleading's well-pleaded factual allegations as true. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007). Hall has alleged shareholder status (Doc. 58 ¶¶ 6, 21–24); the assumption-of-truth standard applies. To the extent Plaintiffs intend a factual 12(b)(1) attack, the standing question is intertwined with the merits – it depends on whether Hall satisfied the SPA's amended § 2.01 closing condition, the precise question on which Hall's contemporaneously filed Motion for Partial Summary Judgment will put a developed record before the Court. Where jurisdictional and merits questions are intertwined, factual 12(b)(1) review must be deferred to the developed summary-judgment record; the Court cannot resolve on the pleadings a factual dispute that is the subject of other live claims in the case. Gentek, 491 F.3d at 332. Plaintiffs themselves admit, in their Answer to the Counterclaims filed the same day as the Partial Motion, that "an actual controversy exists regarding ownership of XP Services." (Doc. 75 ¶ 18.) That admission forecloses any argument that

Hall's shareholder status is so plainly absent from the record that it can be resolved on the pleadings.

**C. The direct-claim treatment in Sections A and B above suffices to defeat the Partial Motion's standing challenge on the pleadings.** The four-category injury analysis in ¶ 46 supra meets Keller's distinct-injury test under the Tooley framework, 495 S.W.3d at 877, on each pleaded category individually. The Partial Motion does not address Hall's specific direct-injury allegations, focusing instead on a generalized "derivative" characterization that the pleaded facts do not support.

**D. Stewart.** Hall acknowledges that Stewart is not currently a named party. Hall reserves the right to move under Federal Rule of Civil Procedure 21 to add Stewart as a counter-defendant on Counts IV and VI, depending on factual developments and discovery.

## VII. Count VI (Civil Conspiracy) States a Claim

The Partial Motion argues that Count VI fails because (a) there is no actionable underlying tort and (b) Allison cannot conspire to breach his own contract. (Doc. 74 at 14–15.) Neither argument reaches the pleading as written.

**A. Underlying torts survive.** Civil conspiracy under Tennessee law requires an underlying predicate tort committed in furtherance of the conspiracy. *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006); see also *Freeman Mgmt. Corp.*, 461 F. Supp. 2d at 642–43 (the very authority Plaintiffs invoke recognizes the predicate-tort requirement). Count III (tortious interference) and Count V (fraud and fraudulent concealment) each independently state claims, as set forth in Sections IV and V above. Each is sufficient to serve as a predicate.

**B. The conspiracy is multi-party, not self-directed; the intracorporate doctrine does not apply.** The Partial Motion's argument that "Allison cannot be liable for allegedly conspiring to

cause himself to breach the SPA" (Doc. 74 at 14) addresses a single overt act in isolation. The conspiracy pleaded in Count VI is among four individuals – Allison, Bruce Stewart, Troy Allison, and Nasr Alghrairi – acting in concert to deprive Hall of his ownership interest. (Doc. 58 ¶¶ 43–47.) The intracorporate conspiracy doctrine recognized in *Trau-Med*, 71 S.W.3d at 703–04, and *Forrester v. Stockstill*, 869 S.W.2d 328, 334–35 (Tenn. 1994), does not bar Count VI for two independent reasons. First, three of the four pleaded conspirators are not XPS employees acting within scope: Bruce Stewart is named in his capacity as Trustee of The Rodney Allison 2019 Irrevocable Trust, a separate legal entity distinct from XP Services; Troy Allison is, on information and belief, neither an officer nor an employee of XPS; and Mr. Alghrairi is a third-party witness with documented competing affiliation as President/CEO of Tricion Defense Group (Ex. JJ). The conspiracy as pleaded therefore extends beyond XP Services' corporate identity. Second, even as to Allison's own conduct, the *Trau-Med* scope-of-employment exception applies. *Trau-Med* held that the intracorporate doctrine "does not apply where corporate officials, employees, or other agents acted outside the scope of their employment and engaged in conspiratorial conduct to further their own personal purposes and not those of the corporation." 71 S.W.3d at 703–04. The First Amended Counterclaim expressly pleads that Allison's conduct was undertaken for "personal benefit" and "self-enrichment at Hall's expense" (Doc. 58 ¶¶ 30, 44), which on Plaintiffs' own pleading-stage standard must be assumed true. *Iqbal*, 556 U.S. at 678. The scope analysis is conduct-by-conduct, not actor-by-actor: Allison may have purported to act in his XPS officer capacity for some acts (binding XPS as a matter of agency law) while engaging in other personal-benefit conspiratorial conduct outside the scope of his employment. Both rationales independently defeat the intracorporate-doctrine objection.

**C. Overt acts are pleaded with specificity.** The counterclaim identifies eight overt acts with dates and actors, including Troy Allison's September 22, 2025 WhatsApp messages vetting South Sudan banking; Troy Allison's December 6, 2025 Abu Dhabi meeting; Stewart's December 8, 2025 call to closing counsel Kilduff requesting a way out of the SPA; the December 12, 2025 Notice of Default; Allison's December 14, 2025 letter to Calidus; Alghrairi's February 2026 declaration; the execution of the GAL MOU; and the February 19, 2026 filing of the original Verified Complaint. (Doc. 58 ¶ 45.) Each of these overt acts either constitutes an independently actionable wrong or advances the overarching scheme to deprive Hall of his ownership interest in XP Services. Documentary evidence subsequently obtained and now part of the record further corroborates the conspiracy: Mr. Alghrairi's December 17, 2025 email to Calidus selectively transmitting only Mr. Allison's commitment letter while suppressing Hall's parallel Owner Letter (Ex. JJ); and the February 5–10, 2026 email exchange in which Calidus disclosed it had been conducting equity-participation discussions with Mr. Alghrairi independent of both Hall and Mr. Allison (Ex. MM; Third Declaration ¶¶ 32–33). Among these, Mr. Alghrairi's December 17, 2025 transmission (Ex. JJ) is particularly probative: it selectively forwarded to Calidus only Mr. Allison's commitment letter while suppressing Hall's parallel Owner Letter, supplying documentary evidence of coordinated information manipulation in furtherance of the conspiracy alleged.

### VIII. Count VII (Conversion) States a Claim as to Tangible Property

The Partial Motion argues that Count VII fails because (a) Tennessee does not recognize conversion of intangible property and (b) the claim is duplicative of the breach-of-contract claim. (Doc. 74 at 15–16.) The intangible-property rule does not bar Count VII as pleaded.

**A. Hall pleads conversion of identifiable tangible property.** Plaintiffs concede the elements of conversion require appropriation, dominion, and defiance of the true owner's rights. *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977). Count VII rests on two categories of tangible property over which Allison has exercised post-closing dominion. First, the books, records, and physical corporate documents of XP Services. The First Amended Counterclaim alleges that Allison has denied Hall – as sole shareholder by virtue of the September 28, 2025 deposit – access to XPS's corporate books, financial records, contracts, and operational documents. (Doc. 58 ¶¶ 50, 60.) These are physical documents to which Hall has a tangible-property right under Tenn. Code Ann. § 48-26-101 (shareholder inspection rights). Conversion lies for the wrongful denial of access to physical corporate records held in another's possession. Second, the escrowed stock certificates representing Hall's contractually-purchased ownership. Pursuant to the SPA closing arrangements, the XPS stock certificates were placed in escrow with Mr. Kilduff. (Doc. 60 ¶ 43.) Hall, as the closing buyer, is the rightful owner of the certificates by virtue of the September 28, 2025 deposit triggering the closing condition of First Amendment § 2.01. Hall has demanded their release; that demand has been refused. While the underlying ownership interest evidenced by the certificates is intangible (and thus outside the scope of conversion under *Bridgeforth* and *Omnicon*), the certificates themselves are tangible chattels. Conversion of physical stock certificates is recognized as a cause of action distinct from conversion of the intangible underlying interest. See Restatement (Second) of Torts § 242 (recognizing conversion of documents that "represent rights in chattels or other tangible things"); see also *PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.,* 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012).

**B.** *Green Wise Homes, Bridgeforth,* **and** *Omnicon* **are distinguishable.** The Tennessee authorities the Partial Motion marshals for the intangible-property rule each addressed distinctly intangible subject matter – misappropriation of information (*Green Wise Homes*), stock options (*Bridgeforth*), and partnership interests (*Omnicon*). None held that physical corporate records or physical stock certificates fall outside the scope of conversion. The appropriate application of the intangible-property rule is to decline conversion treatment for rights that have no physical manifestation – not to categorically immunize a defendant who has taken dominion over tangible items belonging to the counterclaimant.

**C. The conversion claim is not duplicative of the contract claim.** Once closing occurred on September 29, 2025, Allison's post-closing dominion over XP Services' physical books, records, and stock certificates was no longer governed by the SPA; it became a tortious exercise of dominion over Hall's tangible personal property. Allison's denial of access to corporate books and records and his refusal to release the escrowed certificates are not contractual obligations; they are duties not to exercise wrongful dominion over another's tangible property, duties recognized in tort independent of any contract. The SPA does not govern Allison's post-closing custody of XPS's physical documents and certificates.

**D. Alternative pleading.** To the extent any element of Count VII is contingent on Hall's ownership status – itself the central contested issue and the subject of Hall's pending Motion for Partial Summary Judgment – Hall pleads such elements in the alternative under Federal Rule of Civil Procedure 8(d)(2) and 8(d)(3), which expressly authorize alternative and inconsistent pleading. The Court need not resolve the ownership question to allow Count VII to proceed past the pleading stage.

## IX. Conclusion

22

The Partial Motion to Dismiss should be denied in its entirety. As set out in Section II above, the Motion is procedurally improper – it was filed simultaneously with Plaintiffs' Answer to the same counts (Doc. 75), is not the proper vehicle post-pleading, and was filed without meaningful conferral as required by Doc. 11. Independently, on the merits, each of the challenged counts – III, IV, V, VI, and VII – is supported by concrete, dated factual allegations and satisfies the plausibility standard of *Iqbal* and *Twombly* when read in the light most favorable to Hall. The Partial Motion's attack on Count IV depends on assuming the ownership conclusion that is the central contested issue in this case, and that question cannot be resolved on a pleading motion. The unchallenged counts – I, II, VIII, and IX – proceed regardless, and Hall's Motion for Partial Summary Judgment on the ownership issue is being filed contemporaneously herewith, at which time the Court will have a full factual record on which to resolve the central contested issue.

Plaintiffs' Memorandum (Doc. 74) cites additional authorities not specifically addressed above – including string-cited derivative-pleading and conspiracy-elements decisions – that are addressed by the categorical framework set out in Sections IV–VIII and that, in any event, do not displace the binding Tennessee Supreme Court, Sixth Circuit, and Supreme Court authority on which Hall relies. The Court is also respectfully reminded that several of Plaintiffs' supporting authorities are unpublished district court orders or non-precedential Sixth Circuit appendix opinions. *See, e.g., EPAC Techs.*, 810 F. App'x 389 (non-precedential under 6th Cir. R. 32.1(b)); *Bridgeforth v. Jones*, No. M2013-01500-COA-R3CV, 2015 WL 336376 (Tenn. Ct. App. Jan. 26, 2015) (unpublished; *see* Tenn. S. Ct. R. 4(G)(1)); *Stone Door Grp., LLC v. Meade*, 2021 WL 6496753 (E.D. Tenn. July 9, 2021); *Hughes v. Gupta*, 2022 WL 18141469 (W.D. Tenn. Oct. 7, 2022). Where binding and persuasive authority diverge, the former controls.

Finally, by limiting their Motion to Counts III through VII, Plaintiffs have made the affirmative procedural choice to consolidate their available Rule 12(b) defenses into this single Motion. *See* Fed. R. Civ. P. 12(g)(2) (a party making a Rule 12 motion "must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion"). **Any subsequent Rule 12(b) motion challenging Counts I, II, VIII, or IX is barred under Rule 12(g)(2), although defenses preserved by Rule 12(h)(2) and (3) (failure to state a claim and lack of subject-matter jurisdiction) remain available through other procedural vehicles such as a Rule 12(c) motion for judgment on the pleadings or at trial.** Those four counts proceed to discovery and adjudication regardless of how the Court rules on the Partial Motion.

In the alternative, if any count is dismissed, Hall respectfully requests leave to amend under Federal Rule of Civil Procedure 15(a)(2). *Foman v. Davis*, 371 U.S. 178, 182 (1962). Additionally, Hall may separately move under Rule 21 to add Bruce Stewart as a counter-defendant on Counts IV and VI.

Dated: May 8, 2026

Respectfully submitted,

/s/ John Phillip Hall II
JOHN PHILLIP HALL II, Pro Se
P.O. Box 125, Berryville, VA 22611
Phone: (646) 283-0070
Email: jhall@tricion.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2026, a true and correct copy of the foregoing Response in

Opposition to Partial Motion to Dismiss First Amended Counterclaim was served via the Court's

CM/ECF system upon all counsel of record and via email upon:

Carson W. King
Nelson Mullins Riley & Scarborough LLP
1222 Demonbreun Street, Suite 1700
Nashville, TN 37203
carson.king@nelsonmullins.com


/s/ John Phillip Hall II
JOHN PHILLIP HALL II